SPRINGFIELD OIL SERVICES, INC. *v.* JOHN CONLON
(AC 21783)

Dranginis, Flynn and Healey, Js.

Argued November 21, 2002—officially released June 10, 2003

*David M. Wallman,* with whom, on the brief, was *Elizabeth A. Di Russo,* for the appellant (defendant).

*Saul Roffe,* pro hac vice, with whom were *Margaret E. Haering* and, on the brief, *Elias A. Alexiades,* for the appellee (plaintiff).

*Opinion*

DRANGINIS, J. The defendant, John Conlon, appeals from the judgment of the trial court, rendered after a trial to the court, in favor of the plaintiff, Springfield Oil Services, Inc. (Springfield Oil). On appeal, Conlon claims that the court improperly found that Springfield Oil proved by clear and convincing evidence that the assignment of promissory notes to it by its affiliate was fair.[1] We agree and, accordingly, reverse the judgment of the trial court.

The relevant facts and procedural history are as follows. Harvest Oil Company (Harvest) was the general partner of a limited partnership known as Salisbury Associates (Salisbury). Salisbury was formed for the purpose of exploratory oil and natural gas drilling. Units in the Salisbury partnership were offered to investors

---

[1] Although Conlon also claims on appeal that the court improperly failed to find that because the exploration and drilling contract at issue was executed by an unauthorized party, it could not be enforced, Conlon made no attempt to raise that issue by pleading or by evidence at trial. It was called to the court's attention for the first time by way of Conlon's posttrial brief and, consequently, the court did not address that issue in its memorandum of decision. Accordingly, we decline to review the claim. See Practice Book §§ 5-2 and 60-5; see also *Boxed Beef Distributors, Inc.* v. *Rexton, Inc.,* 7 Conn. App. 555, 558, 509 A.2d 1060 (1986) (trial court correctly did not consider claim first brought to its attention by way of posttrial brief).

in a private placement memorandum (memorandum). At the outset, the memorandum warned potential investors: "Investment in the units described herein involves a high degree of risk, and only those persons who are able to bear the financial risks referred to in this memorandum should consider purchasing such units." The memorandum stated, inter alia, that investment in the partnership was advantageous not only because the partnership hoped to develop successful wells, but also because the investment carried significant tax advantages. In addition, the memorandum disclosed that Springfield Oil, the oil and gas driller with which Salisbury was contracting to perform the drilling, was an affiliate of Harvest, the general partner.[2]

The exploration and drilling contract between Salisbury and Springfield Oil, which was referred to in the memorandum as the "turnkey contract," provided that Springfield Oil would drill five wells between 1981 and 1983, and that Salisbury would pay Springfield Oil $700,000 in each of the first two years for acquisition and drilling of the first three wells, and an additional $700,000 for drilling the fourth and fifth wells. The $700,000 installments were payable partly in cash and partly in interest bearing notes, with the accrued balance of each note due on December 31, 1991, December 31, 1992, and December 31, 1993.[3]

Conlon, who was a securities trader, became a limited partner in Salisbury by purchasing one unit in the Salisbury partnership. He paid for that unit partly in cash

---

[2] Bentley Blum is the sole shareholder of both Harvest and Springfield Oil. The two companies have the same officers and business address.

[3] For each $700,000 installment, Salisbury was to pay Springfield Oil $235,000 in cash and give Springfield Oil an interest bearing promissory note for $465,000. The $235,000 cash portion of each installment was to be paid from the cash contributed by the limited partners. The court found that, according to Salisbury's financial records, $64,667.10 was paid on the turnkey contract in 1991 and that no payments were made in 1992 or 1993.

and partly by executing three $50,000 promissory notes payable to the Salisbury partnership. Conlon's promissory notes, as well as those of the other limited partners, were due on the same dates that Salisbury's notes were due to Springfield Oil; Conlon's first $50,000 note was due on December 31, 1991, the second on December 31, 1992, and the third on December 31, 1993.

From 1981 through 1989, inclusive, Salisbury provided Conlon with Internal Revenue Service schedule K-1 forms. Each of the K-1 forms set forth the amount of Salisbury's loss that was allocated to Conlon, which he could use to offset any other income he may have earned, thereby reducing his tax liability.[4] In addition, between 1981 and 1985, inclusive, Salisbury issued periodic reports to Conlon, which purported to set forth information pertaining to the production of the oil and gas wells.

On October 20, 1989, Harvest, Salisbury's general partner, sent Conlon, and presumably the other limited partners, a letter in which it proposed to dissolve the Salisbury partnership. The letter explained that the partnership had been successful with its tax strategy, but that the partnership had not generated sufficient cash flow to pay off Conlon's promissory note obligation. The letter further stated that because of the drop in oil and gas prices, the partnership no longer was economically viable and that the assets of the partnership had little worth. The letter indicated that Salisbury would, therefore, dissolve the partnership and assign each partner his or her proportionate share of the assets and note obligations. It also indicated that Conlon could restructure his financial obligation by accepting either of two alternatives by November 20, 1989. Conlon could either (1) execute a new $22,500 promissory note, payable to Springfield Oil, which would be due in fifteen

---

[4] Each of the K-1 forms introduced at trial showed a loss.

years, along with a fifteen year assignment of production income in lieu of all future interest on the new note, or (2) remit $45,000 to Springfield Oil as "full and final settlement of [his] Note." Finally, the letter stated that if Conlon did not respond by the date indicated, Harvest would assume that Conlon did "not agree to amend the Partnership Agreement which [would] allow for this proposed dissolution and that [he did] not wish to modify the terms of his original Promissory Note." The letter was signed by Harvest, as general partner. Conlon did not respond to that letter.

Thereafter, on December 31, 1989, Harvest dissolved the Salisbury partnership. Upon dissolution, Harvest assigned to Springfield Oil all of its assets, including Conlon's promissory notes, as well as the promissory notes of the other limited partners, and its drilling rights to the oil and gas wells.

On April 11, 1990, Harvest sent Conlon a letter advising him that pursuant to the October 20, 1989 letter, the Salisbury partnership had been dissolved and that because he had not responded to the October letter, his promissory notes would be payable on their original due dates. The letter did not, however, provide any details regarding the dissolution, namely, that the partnership assets were assigned to Springfield Oil. The letter also did not provide an accounting as to the value of Salisbury's assets at the time of dissolution. On June 11, 1992, Springfield Oil sent Conlon a letter indicating that the first of his three promissory notes had come due. On November 9, 1995, Springfield Oil sent a letter to Conlon in which it demanded payment of the three promissory notes, totaling $150,000, plus interest. Conlon did not respond to either of those letters.

Thereafter, Springfield Oil brought this action against Conlon to enforce the three promissory notes that Conlon had executed in favor of Salisbury and which Salis-

bury subsequently had assigned to Springfield Oil. In its complaint, Springfield Oil alleged that the three notes were past due and that Conlon had failed to pay the amount due under the terms of the notes when it demanded payment.

Conlon filed an answer in which he admitted that he had executed the notes in connection with his purchase of a unit in the Salisbury partnership and that he had not paid the debt represented by those notes. He denied the remaining allegations of Springfield Oil's complaint. Conlon also filed four special defenses.[5] In his first special defense, Conlon alleged, inter alia, that Harvest, the general partner, breached its partnership duties by failing to maintain books and records and by dissolving the partnership for reasons other than those permitted by the partnership agreement. In his second special defense, Conlon alleged that the general partner breached its fiduciary duties to the limited partners by assigning the promissory notes to its affiliate, Springfield Oil, thereby attempting to obtain payment from the limited partners without accounting to the limited partners, by disposing of assets, including the oil and gas wells or the proceeds therefrom and the promissory notes, without adequate consideration or without accounting for the consideration actually received, by engaging in acts of self-dealing and by failing to keep the limited partners informed of the affairs of the partnership. In his third special defense, Conlon alleged that the general partner had sold or otherwise disposed of assets of the partnership and failed to account for the proceeds of the sale or disposition, and therefore was liable to the limited partners for conversion of partnership assets. Finally, in his fourth special defense, Conlon alleged that the general partner breached its

---

[5] Conlon originally filed five special defenses. Before trial, he withdrew his fifth special defense, which alleged that Springfield Oil's claim was barred by the applicable statute of limitations.

fiduciary duties by failing to exercise good faith and integrity in conducting the affairs of the partnership. Springfield Oil filed a reply to Conlon's special defenses, in which it essentially denied the allegations set forth therein.

Prior to trial, Springfield Oil stipulated that it was not a holder in due course with regard to the notes and, therefore, was subject to any of the defenses that Conlon was entitled to assert against Harvest.[6]

Only two witnesses testified at trial, Conlon and Jerry Karlik, the vice president of both Harvest and Springfield Oil. Conlon testified that he did not remember anything about his investment in the Salisbury partnership. When he was shown the closing documents and promissory notes, Conlon admitted that it was his signature that appeared on those documents.

Karlik testified as follows. Harvest provided various documents to potential investors of the Salisbury partnership, including the private placement memorandum, some closing documents and the partnership agreement.[7] In the memorandum, Harvest disclosed that Bentley Blum was the sole shareholder of both the general partner, Harvest, and Springfield Oil, with which Salisbury had contracted to conduct the exploration and drilling of the wells. The terms of that drilling contract were disclosed in the memorandum as well. Both the general and limited partners were of the understanding that the promissory notes of the limited partners would be paid off by revenues generated by oil and gas sales, provided the wells produced enough revenue to do so.

Karlik further testified that Springfield Oil either drilled the wells itself or hired third parties to conduct

---

[6] See General Statutes § 42a-3-301 et seq.

[7] The private placement memorandum, closing documents and partnership agreement were all admitted as full exhibits at trial.

the drilling. The drillers would provide daily drilling logs and Harvest would use those logs to generate production reports, which were later sent to the Salisbury limited partners. Although Karlik testified that production reports were likely issued to the limited partners for all of the years that the partnership was in existence, 1981 through 1989, inclusive, the production reports produced at trial were solely for the years 1981 through 1985, inclusive.[8] Karlik admitted that he could not locate any reports for the years 1986 through 1989 in the files of either Harvest or Springfield Oil. Moreover, Karlik conceded that the production reports that were introduced contained notations indicating that Salisbury was experiencing difficulty in obtaining production and revenue figures from the drillers and the purchasers of the oil and gas, respectively. Springfield Oil did not produce any documentation at trial indicating that the reporting problems had been rectified before the partnership was dissolved.

Additionally, Karlik testified that the partnership was dissolved on December 31, 1989, and that at that time, Salisbury owed Springfield Oil approximately $2.1 million but had only $1.5 million in assets. According to Salisbury's final balance sheet for the period December 31, 1988, through December 31, 1989, which was introduced at trial, the $2.1 million debt consisted of Salisbury's notes payable to Springfield Oil, plus accrued interest payable. Karlik conceded, however, that he did not have copies of the notes evidencing Salisbury's debt to Springfield Oil. According to Karlik and Salisbury's balance sheet, the $1.5 million in assets consisted mainly of notes receivable from the limited partners, including Conlon's notes totaling $150,000.

Finally, Karlik testified that on the date of dissolution, December 31, 1989, he assigned the notes of the limited

---

[8] The 1985 report did not include production figures for the entire year. It reflected production for the period January 1 to June 30, 1985.

partners, including Conlon's notes, to Springfield Oil in full satisfaction of Salisbury's debt. He testified that he also assigned Salisbury's drilling rights to Springfield Oil at that time. The drilling rights to the wells were represented on Salisbury's balance sheet only as to the oil and gas sales they generated.[9] Karlik conceded that although the drilling rights were an intangible asset of the Salisbury partnership, Salisbury did not include an account on its balance sheet representing the value of the drilling rights themselves. Furthermore, according to Karlik, although the partnership still owned the drilling rights to the wells at the time of dissolution, the drilling rights were of little or no value because the wells were not producing. Karlik conceded, however, that both Harvest and Springfield Oil anticipated that postdissolution, there would be "some" revenue generated from those wells.

On the basis of the testimony and documentary evidence adduced at trial, the court concluded that Springfield Oil, because it was the assignee of the fiduciary Harvest, had the burden of proving by clear and convincing evidence that Harvest had acted in accordance with its fiduciary duties when it assigned Conlon's notes to Springfield Oil. The court further found that Springfield Oil had demonstrated by clear and convincing evidence that Harvest had acted in accordance with its duties as a fiduciary in assigning Conlon's promissory notes to its affiliate, Springfield Oil. The court reasoned, in reliance on *Konover Development Corp.* v. *Zeller*, 228 Conn. 206, 635 A.2d 798 (1994), that because Conlon was a sophisticated securities trader and because Salisbury was obligated to pay Springfield Oil $2.1 million for its drilling services, an obligation that had been previously disclosed to Conlon, Harvest's assignment of Conlon's notes to Springfield Oil in satisfaction of that obligation did not constitute a breach of fiduciary

---

[9] The balance sheet contained an entry entitled, "A/R oil and gas."

duty. The court further found that the consideration was shown to be adequate because the venture presented the hope of a share in successful oil and gas wells, along with an extremely advantageous tax advantage even if the drilling proved unsuccessful. Finally, the court concluded that Conlon's special defenses had no merit because Harvest fully discharged its fiduciary duty by disclosing its affiliation with Springfield Oil and the terms of the drilling contract and because Harvest's failure to keep adequate records did not create the liability for the cost of drilling the wells. This appeal followed. Additional facts will be set forth where necessary.

Conlon claims that the court improperly found that the fairness of Harvest's 1989 assignment of the notes to Springfield Oil was proven by clear and convincing evidence. We agree.

Conlon's claim requires us to review a finding of fact. "The standard of review with respect to a court's findings of fact is the clearly erroneous standard. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . ." (Internal quotation marks omitted.) *Blitz* v. *Subklew*, 74 Conn. App. 183, 186, 810 A.2d 841 (2002).

In determining whether the court's finding was clearly erroneous, we must examine that finding in the context of the heightened standard of proof imposed on a fiduciary. See *Spector* v. *Konover*, 57 Conn. App. 121, 127, 747 A.2d 39, cert. denied, 254 Conn. 913, 759

A.2d 507 (2000). On appeal, Springfield Oil does not dispute that Harvest, as the general partner of Salisbury, was a fiduciary.

"Once a [fiduciary] relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary." (Internal quotation marks omitted.) *Konover Development Corp.* v. *Zeller*, supra, 228 Conn. 219. "Furthermore, the standard of proof for establishing fair dealing is not the ordinary standard of proof of fair preponderance of the evidence, but requires proof either by clear and convincing evidence, clear and satisfactory evidence or clear, convincing and unequivocal evidence." (Internal quotation marks omitted.) Id., 229–30. That burden of persuasion is sustained if the evidence "induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Internal quotation marks omitted.) *Parker* v. *Slosberg*, 73 Conn. App. 254, 264, 808 A.2d 351 (2002).

Accordingly, in the present case, Springfield Oil, because it is the assignee of Harvest, which was a fiduciary of the partnership, had the burden to prove, by clear and convincing evidence, that Harvest dealt fairly with Conlon when it assigned his notes to Springfield Oil. We must determine whether the court properly found that Springfield Oil met that burden by clear and convincing evidence.

In the present case, the court relied on *Konover Development Corp.* v. *Zeller*, supra, 228 Conn. 228, in finding that Harvest's assignment of Conlon's notes to Springfield Oil was fair. In *Zeller*, our Supreme Court held that "in certain circumstances a fiduciary may demonstrate that a particular transaction is fair by showing (1) that the fiduciary made a free and frank

disclosure of all the relevant information he had, (2) that the consideration was adequate, (3) that the principal had competent and independent advice before completing that transaction, and (4) the relative sophistication and bargaining power among the parties." *Spector* v. *Konover*, supra, 57 Conn. App. 128–29.

"The *Zeller* standard effectively preserves the heightened standards required of fiduciaries while allowing parties in a fiduciary relationship the flexibility to contract freely among themselves. The standard articulated in *Zeller* is most appropriately applied in situations where a principal challenges the fairness of a particular transaction in which both the principal and the fiduciary made a fully informed decision to act in a manner that is seemingly contrary to the normal fiduciary relationship. Implicit in the *Zeller* standard is the requirement that the principal consent to the transaction carried out by the fiduciary. *To invoke the Zeller standard in an attempt to justify the fairness of a particular transaction, the fiduciary must first be able to show that there was some agreement among the parties allowing the fiduciary to act in a manner that may otherwise be a breach of fiduciary duty.*" (Emphasis added.) Id., 129.

In the present case, there was an agreement between Harvest and Conlon that Salisbury would contract with Harvest's affiliate, Springfield Oil, to perform drilling services and that Salisbury would compensate Springfield Oil for those services. Springfield Oil failed, however, to offer any evidence of an agreement allowing Harvest to assign the entirety of the partnership's assets to its affiliate, Springfield Oil, in satisfaction of Salisbury's debt to Springfield Oil, upon dissolution of the partnership without a valuation of the partnership assets, a netting of the value of the assets of the partnership against its liabilities and an accounting to the limited partners.

On the contrary, article IX of the Salisbury partnership agreement expressly stated that upon liquidation and dissolution of the partnership, the general partner shall "[a]s promptly as possible after dissolution, cause a final statement of account to be prepared, which shall show with respect to each Partner the status of such Partner's Capital Account and the amount, if any, owing to the Partnership . . . [d]etermine the interest of the Partnership in each Partnership oil, gas and other mineral property . . . . [d]etermine the value of the Partnership properties using appraisal techniques which he deems to be appropriate, taking into account the nature of the property interests and their potential for future recovery of reserves and shall further determine the salvage value of all equipment on such property . . . ." The partnership agreement further states that the general partner "shall [s]ell or otherwise dispose of all assets of the Partnership for cash *or on the best terms available* to the fullest extent the [general partner] deems such disposition necessary to pay all Partnership debts *or as otherwise may be in the best interests of all Partners*." (Emphasis added.)

Even under the *Zeller* standard, Springfield Oil failed to establish that Harvest acted fairly in assigning Conlon's notes to Springfield Oil because it failed to demonstrate that Harvest made a full and frank disclosure of all of the relevant information regarding the assignment and because it failed to demonstrate that the consideration was adequate.

The court found, in reliance on *Zeller*, that Springfield Oil had proved by clear and convincing evidence that Harvest's fiduciary duty was discharged because Conlon was sophisticated and because Harvest had made full disclosure of "the relationship and terms that have resulted in the assignment" of Conlon's notes to Springfield Oil. That finding is problematic for two reasons. First, it seems to imply that the assignment was appro-

priate because it was reasonable for Harvest to assign a partnership asset in payment of a partnership debt. Under *Zeller*, however, the fiduciary, Harvest, had a "duty to deal fairly with [Conlon], not simply to act reasonably . . . ." *Konover Development Corp.* v. *Zeller*, supra, 228 Conn. 221. The assignment might have been fair if Harvest had assigned only the notes, or if it had assigned the notes in combination with other assets, provided the combined value of the assignment did not exceed the amount of the debt, which was $2.1 million. Here, however, Harvest assigned to its affiliate, Springfield Oil, two assets, namely, the notes and the drilling rights to the wells. The drilling rights were a partnership asset that was never listed on Salisbury's balance sheet and, as best as we can tell, was never valued, even at the time of dissolution.

Second, the court's finding seems to imply that because Conlon was sophisticated and because he knew that Springfield Oil, Harvest's affiliate, would be doing the drilling and would be compensated by the partnership for those services and chose to invest in the partnership anyway, Harvest owed Conlon some lesser duty with respect to transactions involving the turnkey contract. Such a finding, however, contravenes *Zeller*, which reasoned that a general partner's fiduciary duty is an ongoing duty, and extends to all decisions that have "adverse, concrete financial consequences that [flow] foreseeably and directly from that decision . . . ." Id., 222. By agreeing to the terms of the turnkey contract between Harvest and Springfield Oil, Conlon did not agree to give Harvest carte blanche in its dealings with Springfield Oil. The terms of a limited partnership agreement cannot negate the fiduciary duty of the general partner even where the relationship and terms of a contract between the fiduciary and its affiliate are disclosed and even where the partnership involves sophisticated parties. See id., 226. Furthermore, *Zeller*

requires more than a disclosure of the relationship and terms underlying the transaction. *Zeller* requires that the fiduciary make a free and frank disclosure of all the relevant information it has about *the particular transaction.* Id., 228. In this case, the particular transaction at issue was not Conlon's decision to become a limited partner in Salisbury. The particular transaction at issue was the dissolution of the partnership and the consequent assignment of the notes and drilling rights, without an accounting to the limited partners.

We conclude that Springfield Oil did not demonstrate by clear and convincing evidence that Harvest's assignment of Conlon's notes to Springfield Oil was fair because Harvest did not make a free and frank disclosure to Conlon of all relevant information regarding the assignment at the time of dissolution. Harvest assigned the notes and drilling rights, yet it failed to appraise or to otherwise set a value for the drilling rights that were, in addition to the notes of the limited partners, an asset of the partnership that could have been used to offset Salisbury's debt to Springfield Oil. Harvest also failed to provide Conlon with an accounting after dissolution.

Springfield Oil also did not demonstrate that the compensation that Harvest gave to Springfield Oil in satisfaction of Salisbury's debt was adequate. The court found that Harvest discharged its fiduciary duty by using the notes as a partnership asset solely to fulfill a partnership obligation that was clearly identified in the private placement memorandum. The problem with that finding is that because there was no valuation of the drilling rights, or an accounting, either before or after dissolution, the court had no way of determining the extent of that obligation. Although the court emphasized the fact that both the relationship between Harvest and Springfield Oil and the terms of the turnkey contract had been fully disclosed to Conlon before he

entered into the partnership, that fact alone is not decisive in determining that the transaction was fair.

Karlik testified that the assets of the partnership were exceeded by its liabilities and that the only real asset that the partnership had at the time of dissolution was the notes of the limited partners. He stated that although the rights to the wells also were an asset, those rights were of "little value." To accept Karlik's seemingly unsupported testimony that the drilling rights had little value would, however, inappropriately shift the burden of proving adequate consideration from the fiduciary to Conlon. Furthermore, the fact that the drilling rights had "little value" implies that they had, at least, *some value* and, accordingly, the drilling rights should have been appraised and Harvest should have accounted for their value at the time of dissolution.

The drilling rights to the wells were, however, never appraised or valued. That fact is important because any value realized upon the sale or other disposition of the drilling rights should have been used to offset Salisbury's debt to Springfield Oil before it could fairly demand any payment from Conlon. Other than Karlik's testimony, Springfield Oil offered no proof as to what the drilling rights to the wells were worth at the time that the partnership was dissolved. The balance sheet of Salisbury, which Springfield Oil adduced at trial, showed only the amount of receivable sales that the wells had generated for a specific period of time. The balance sheet did not contain an entry that showed the value of the drilling rights to the wells as an asset in and of themselves.

Moreover, one of the options offered to Conlon in the October 20, 1989 letter that Harvest sent to Conlon was that Conlon could execute a new promissory note, payable to Springfield Oil, in the amount of $22,500 along with a fifteen year assignment of production

income. The fact that Springfield Oil made that option contingent on Conlon executing an assignment of production income demonstrates that Harvest anticipated that there would be future production from the wells. In fact, Karlik conceded at trial that Harvest anticipated that there would be "some" production. Additionally, there also was no proof that either the rights to the wells, or the promissory notes of the limited partners, were disposed of on the best terms possible or in the best interests of all of the partners, as required by the partnership agreement. For instance, Harvest originally had made Conlon an offer of compromise, but then assigned Conlon's promissory notes to Springfield Oil at full value. In other words, there is no evidence that indicates that Harvest attempted to bargain down Salisbury's debt to Springfield Oil.

Additionally, the sales generated from the oil and gas production from the wells was intended to be used, in part, to pay off, or at least pay down, the notes of the limited partners. Although Karlik testified that the value of the wells was diminished because production was down to a trickle, there was no supporting evidence as to the amount of oil and gas that the wells had produced for the last three years of the partnership's existence because Springfield Oil did not have production reports for 1986 through 1989, inclusive. Furthermore, the reports for the years 1981 through 1985 that were introduced at trial did not necessarily paint a true picture of production and sales because the reports themselves indicated that Salisbury was having difficulty getting *the drillers*[10] and purchasers to report. None of the documentation introduced at trial indicate that the reporting problems were rectified prior to dissolution. Accordingly, Salisbury may have made sales that were never posted or otherwise used to offset Conlon's liability to the partnership.

---

[10] Springfield Oil was one of those drillers.

Finally, Springfield Oil makes much of Conlon's silence and acquiescence in the face of Harvest's written proposal to dissolve and offer to compromise. The partnership agreement, however, did not require Conlon to demand an accounting upon dissolution. Article IX expressly required that upon "dissolution . . . the [general partner] *shall . . . cause a final statement of account to be prepared, which shall show with respect to each Partner* the status of such Partner's Capital Account and *the amount, if any, owing to the Partnership . . . .*" Furthermore, it was Springfield Oil's burden to prove by clear and convincing evidence fair consideration for the assignment of the notes upon dissolution. "[C]lear and convincing proof is a standard frequently imposed in civil cases where the wisdom of experience has demonstrated the need for greater certainty . . . ." (Internal quotation marks omitted.) *Schaffer* v. *Lindy*, 8 Conn. App. 96, 104, 511 A.2d 1022 (1986). Such a heightened burden of proof cannot be met by Conlon's silence.

On the basis of our examination of all of the evidence, we are left with the definite and firm conviction that a mistake has been made with regard to the court's finding that Springfield Oil proved by clear and convincing evidence that Harvest's assignment of Conlon's notes to Springfield Oil, in partial satisfaction of Salisbury's debt to Springfield Oil, was fair. Therefore, the defendant was entitled to prevail on his special defense that Harvest breached its fiduciary duties to the limited partners in assigning the notes.

The judgment is reversed and the case is remanded with direction to render judgment in favor of the defendant.

In this opinion the other judges concurred.