******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MARK P. CHIOFFI *v.* CHRISTOPHER G.
MARTIN ET AL.
(AC 38443)

Lavine, Elgo and Beach, Js.

*Syllabus*

The plaintiff sought to recover damages from his law partner, the defendant
M, for, inter alia, breach of fiduciary duty and breach of a partnership
agreement arising out of the dissolution of the limited liability partner-
ship they had formed for the practice of law. The plaintiff claimed, inter
alia, that M, as part of the winding up of the partnership, had improperly
distributed certain assets to himself in violation of the partnership
agreement. M filed a counterclaim, seeking damages and attorney's fees.
At the time of the dissolution of the partnership, M had a 57 percent
interest in the partnership, and the plaintiff had a 43 percent interest
in the partnership. Under the partnership agreement, revenue was to
be allocated between three capital accounts, namely, a corporate
account for which M was responsible, a trusts and estates account for
which the plaintiff was responsible, and a "remaining" account into
which all other revenues were allocated. The distribution of funds to
the plaintiff and M was governed by § 3.02 of the partnership agreement,
which required that, following any distribution, the balances in the
plaintiff's and M's capital accounts be directly proportionate to their
ownership percentages. The partnership agreement also contained
restrictions in § 4.03 on certain actions that the plaintiff and M could
take. Any losses or expenses, including attorney's fees, arising from a
partner's actions were to be allocated exclusively to that partner's capital
account. After a trial to the court, the court rendered judgment for the
plaintiff on his claim for breach of contract. The trial court found that
M had breached the partnership agreement and awarded the plaintiff,
inter alia, damages and attorney's fees. On M's appeal and the plaintiff's
cross appeal to this court, *held*:

1. The trial court properly found that M breached § 3.02 of the partnership
   agreement when he distributed revenues from the corporate account
   to himself without regard for the required ratio of partnership assets in
   his and the plaintiff's capital accounts; the clear language of the partner-
   ship agreement provided that the allocation of partnership revenues
   and expenses was to continue through the time of the final distributions,
   and that distributions were to be made such that the plaintiff's and M's
   capital account balances were to be in proportion to their ownership
   interests in the partnership, and there was nothing in that portion of
   the partnership agreement to suggest that the specifically designed bal-
   ancing of accounts was to be abandoned when one partner gave notice
   of his intention to withdraw from the partnership.

2. The trial court improperly concluded that M breached § 4.03 of the partner-
   ship agreement when he assigned corporate accounts receivable and
   works in progress to a new law firm that he had formed; the restrictions
   listed in § 4.03 pertained to the partnership's dealings with third parties,
   there was no actionable breach on the basis of § 4.03, as M's assignment
   of corporate assets did not create additional partnership losses or
   expenses, and even if M could be deemed to have breached § 4.03 (b), the
   sole remedy was the assignment of that expense to his capital account.

3. The trial court did not abuse its discretion when it ordered a direct
   payment from M to the plaintiff rather than a reduction in M's capital
   account; because M breached the agreement by distributing partnership
   assets to himself without observing the balance of the corporate
   accounts, a reduction in his capital account would have been pointless,
   as it would have permitted him to distribute assets to himself without
   regard to the relative states of the accounts, and the partnership
   agreement provided an exception to the limited liability of a partner
   where, as here, M violated an express term of the partnership agreement,
   which subjected him to personal liability for his breach of the partner-
   ship agreement.

4. The trial court's award of attorney's fees to the plaintiff pursuant to § 4.03

of the partnership agreement was improper and could not stand, as that court erred in finding that M had breached § 4.03, and because the court found no other basis for its award of attorney's fees, that award was vacated.

5. The trial court improperly failed to conclude that M breached his fiduciary duty to the plaintiff; M took partnership assets over the objection of the plaintiff, who received no benefit or consideration for the self-dealing distributions made by M, the partnership agreement did not compromise or expressly limit the parties' duty of loyalty, and because the plaintiff's complaint had requested attorney's fees for M's breach of fiduciary duty, the case had to be remanded for a determination of whether the plaintiff was entitled to such fees and, if so, in what amount.

6. The trial court did not abuse its discretion in its method of calculating damages; that court properly calculated the amount that would have been distributed by the partnership to the plaintiff if M had adhered to the requirements of the partnership agreement and the partnership's liabilities had not been satisfied predominantly by the plaintiff's share, and any additional funds placed in M's capital account would have been profits of the corporate department, to which the plaintiff was not entitled.

7. The trial court did not commit clear error or abuse its discretion in finding that the plaintiff waived his claim for an accounting; the partnership agreement contained no absolute requirement for an accounting, which is discretionary pursuant to statute (§ 34-339 [b]), the plaintiff litigated his claims at trial and did not mention the request in his complaint for an accounting until posttrial reargument, and even if there was no waiver, the trial court's decision denying an accounting was not an abuse of discretion, as the trial and discovery constituted a remedy at law that was available to the plaintiff, and the expense of an accounting and the resulting delay outweighed whatever benefit would have been gained by ordering an accounting.

Argued October 12, 2017—officially released April 17, 2018

*Procedural History*

Action to recover damages for, inter alia the named defendant's alleged breach of contract, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the named defendant filed a counterclaim; thereafter, the matter was transferred to the Complex Litigation Docket and tried to the court, *Genuario, J.*; judgment for the plaintiff on the complaint in part and on the counterclaim; subsequently, the court granted the plaintiff's motions for reargument and attorney's fees, and amended its judgment; thereafter, the court denied the named defendant's motion for reargument, and the named defendant appealed and the plaintiff cross appealed to this court; subsequently, the court, *Genuario, J.*, issued an articulation of its decision. *Reversed in part; further proceedings.*

*William H. Champlin III*, with whom, on the brief, was *Mark S. Gregory*, for the appellant-appellee (named defendant).

*Timothy G. Ronan*, with whom, on the brief, was *Assaf Z. Ben-Atar*, for the appellee-appellant (plaintiff).

*Opinion*

BEACH, J. This action arises out of the dissolution of a registered limited liability partnership. The defendant Christopher G. Martin[1] appeals, following a trial to the court, from the judgment rendered in favor of the plaintiff, Mark P. Chioffi, on the count of the plaintiff's complaint which alleged breach of contract. The trial court awarded Chioffi $34,120 in compensatory damages, $103,000 in attorney's fees, and $6226.73 in costs. The defendant claims on appeal that the court erred in (1) finding a breach of § 3.02 of the parties' partnership agreement; (2) finding a breach of § 4.03 of the partnership agreement; (3) ordering the defendant to pay damages directly to the plaintiff rather than ordering a reduction in the defendant's capital account in the partnership; and (4) awarding attorney's fees to the plaintiff. The plaintiff cross appealed, claiming that the court (1) erred in not finding a breach of fiduciary duty, as alleged in count one of his complaint; (2) erred in its calculation of damages; and (3) abused its discretion in holding that the plaintiff waived his claim for an accounting. We agree with the defendant's second and fourth claims and the plaintiff's first claim. Accordingly, we reverse in part the judgment of the court and remand the case for a hearing on attorney's fees. We otherwise affirm the court's judgment.

The parties, partners in Martin Chioffi LLP, a law firm, entered into a partnership agreement in 2012; the agreement by its terms was to be effective retroactively to January 1, 2010. The agreement comprehensively described and prescribed the operations of the partnership; a copy of the partnership agreement was an exhibit before the court.

The agreement contemplated that revenue was to be allocated between three capital accounts: the corporate account, for which Martin was responsible; the trusts and estates account, for which Chioffi was responsible; and the "remaining" account, into which all other revenues were allocated. See § 3.01 (c). The balance of each account was to be adjusted periodically by adding to it the appropriately allocated share of partnership revenue, and subtracting from it the allocable share of expenses and distributions to partners. See § 2.02.

The process used to determine the "calculation and allocation of net profits and losses" was set forth in article III of the agreement. As previously mentioned, there were three capital accounts corresponding to the three departments: corporate, trusts and estates, and everything else. Section 3.02 (b). Revenues were initially allocated to the appropriate account. Section 3.02 (c). Expenses were also allocated among the three departments. "Direct expenses" of each department were to be allocated accordingly; "indirect expenses," such as rent, utilities, and costs of administrative per-

sonnel, were allocated among the departments "in proportion to the number of billing professionals" in each department. Section 3.01 (d) (ii). The net profits or losses for each department were determined by subtracting the direct and indirect expenses attributed to each department from the revenue so attributed. The net profits for the corporate account were then allocated to Martin's capital account, those of the trusts and estates department to Chioffi's capital account, and net profits for the "remaining," or other, department were divided between Martin's capital account and Chioffi's capital account in proportion to the ownership percentage of each partner. Section 3.01 (e) and (f). Martin's ownership interest was 57 percent and Chioffi's 43 was percent. Schedule 1 of the partnership agreement.

The allocation process did not in itself cause the actual, physical transfer of funds; rather, the process simply sorted revenues and expenses into separate capital accounts. Distribution of funds to partners was governed by § 3.02 of the agreement: "Distributions shall be made monthly and at such other times as the partners agree such that, following any such distribution, the capital account balances of the partners shall be directly proportionate to the ownership percentages of such partners. Monthly distributions for determining net income shall include cash paid to each partner, 401 (k) contributions, all related expense for business, automobile, and certain entertainment for certain clients not considered joint as it relates to the firm consistent with past practices of the partnership."

The management of the partnership was consistent with the allocation of revenues. Martin was the managing partner. Section 4.01. Article IV, entitled "Management; Restrictions," indicated that the partnership was to be "managed and the conduct of its business . . . controlled (except as otherwise specifically provided herein) by the partners" such that "any decisions pertaining to the provision of corporate services [were to] be made by Martin in his sole discretion," and Chioffi enjoyed identical authority as to the trusts and estates department. Section 4.02. Other decisions were to be made by mutual consent.

Article IV also listed, in § 4.03, seven specific actions which a partner was prohibited from performing except with the consent of the other partner. These "restrictions" included, in part, compromising partnership claims, committing the partnership to financial obligations, and selling or assigning an interest in the partnership. Any losses or expenses, including attorney's fees, arising from such transgressions were to be "allocated exclusively to such partner's capital account." Section 4.03.

Further sections governed a partner's withdrawal from the partnership and its dissolution. Section 7.01

provided that a partner could withdraw at any time, provided that the withdrawing partner was to give at least ninety days notice before the effective date of the withdrawal. Section 7.02 provided that upon the withdrawal of a partner, "the partners shall dissolve and liquidate the partnership pursuant to [article VIII]."

Article VIII, in turn, set forth the procedures for dissolution and liquidation. The partners were to "work together in good faith" to "immediately" wind up the affairs and to "minimize to the greatest extent possible the costs incurred" by the partnership or any partner. Section 8.01. The costs which were incurred were to be "allocated and apportioned to the partners in accordance with the departmental profit calculation."[2] Id.

Section 8.02 provided for liquidation. If the partnership were dissolved, the partners were to be the "liquidating trustees" and were to take appropriate actions, including making "final distributions" pursuant to § 8.03 and the Connecticut Uniform Partnership Act (act), General Statutes § 34-300 et seq. The costs of dissolution and liquidation were to be expenses of the partnership, and were "to be allocated and apportioned between Martin and Chioffi in accordance with their ownership percentages . . . ." Section 8.02. The partners were to continue to operate the affairs of the partnership "until final distributions have been made . . . ." Section 8.02.

According to § 8.03, the assets of the partnership, "net of partnership liabilities," were to be distributed "upon liquidation . . . ." The net assets to be distributed at that time included "all accounts receivable, works in progress and contingent fees with respect to any partner [which were to] be allocated in accordance with the departmental profit calculation,"[3] and any "special allocations" were to be determined in accordance with the respective ownership percentages of the partners, unless otherwise agreed by the parties. Any other assets were also to be distributed in accordance with the ownership percentages. Id.

The following facts, as found by the trial court, and procedural history are relevant to our resolution of the claims on appeal. As the court stated in its memorandum of decision: "This action arises out of the dissolution of a limited liability partnership formed for the practice of law. The dissolution was occasioned by the voluntary withdrawal from the partnership of the defendant Martin, who owned a 57 percent interest in the partnership. The plaintiff was the only other [equity] partner. He owned a 43 percent interest. . . .

"This dissolution did not occur under the best of circumstances. Besides . . . deficient communication between the partners and . . . different points of view, the dissolution was plagued by two particularly troublesome and substantial issues. The first dealt with the

lease, to which the partnership was a party, and the second dealt with the disproportionate balances reflected in the partners' capital accounts." (Footnotes omitted.)

In its memorandum of decision, the court described the partnership's lease and its ramifications for the dissolution as follows: "In June, 2012, the partnership entered into a lease that did not expire until December 31, 2017. The base monthly rent of the lease was $24,916.67. Both parties described the lease as both a liability and an asset. The lease required substantial payments and was a substantial liability to the partnership. The rent payable was viewed by the parties to be below fair market value and therefore was considered a significant asset. Moreover, the partnership as a tenant had various subtenants whose rent covered $11,961.67 of this partnership's monthly rental obligation. Because each party intended to form [his] own firm upon dissolution of the partnership, each partner initially had a desire to remain in the premises or, at least, in a portion of the premises. The plaintiff and the defendant, however, could not reach an agreement as to an allocation of the space contained in the premises. Notably, neither partner personally guaranteed or signed the lease in [his] individual capacity, and the only obligor under the lease was the limited liability partnership. Both the plaintiff's new firm . . . and the defendant's new firm . . . continued to occupy the space subsequent to the dissolution of the partnership on November 15, 2013, until such time as the defendant's new firm vacated the premises in June, 2014. From November 15, 2013, the parties practiced law and operated their new firms independently of one another, communicating only when necessary regarding their shared space and the winding up process. The defendant's new firm did not pay any rent for its occupancy of this space to the partnership or the lessor during the period between dissolution of the partnership and its vacating of the premises in June or, for that matter, thereafter. During the postdissolution period, the plaintiff contributed $12,600 to assist the partnership in meeting its rental obligations. The rent that was due the lessor was fully paid by September 1, 2014, by virtue of certain assets of the partnership (cash remaining in the partnership accounts, accounts receivable of the remaining departments, rent from the subtenants, the plaintiff's contribution as indicated and finally by allocation of $35,000 of the partnership's $74,750 security deposit). Both [the] plaintiff and the defendant individually entered into discussions with the lessor concerning a new lease or leases, but no agreement was reached until after the defendant's firm had vacated the premises. In August, 2014, the plaintiff's new firm and the lessor entered into a new lease, effective September 1, for the same space previously occupied by the partnership and at the same rental price. The agreement between the plaintiff's new firm and the

lessor also eliminated liability of the partnership for the balance of the partnership's leasehold obligations and allowed the plaintiff's new firm to continue to receive the benefit of the rents payable by the subtenants. The partnership's security deposit of $74,750 was allocated as follows: $35,000 for the payment of the partnership rental obligations up and through August 31, 2014, and $39,750 as a portion of the plaintiff's new firm's security deposit."

The court found the following facts regarding the state of the capital accounts and the liquidation of the partnership: "[Although] all three departments of the partnership were financially healthy, the corporate department generated far more net income and, because it had more billing professionals, was responsible for a larger share of the indirect costs of the partnership. During the last two years of the partnership's existence, the defendant took distributions from his capital account [in] excess of the net income that was allocable to his capital account on a cash basis. In other words, he took more money than he made during that time period and, in fact, on the date he gave notice of his intent to withdraw, his capital account was negative in excess of $150,000. This excessive distribution was, at least in part, financed by increases in the partnership credit line and increases in draws against that credit line. These excessive distributions were done with the knowledge and consent of the plaintiff, as was the activity regarding the partnership credit line. The defendant's rationale for taking these distributions, as expressed to the plaintiff, was based upon the fact that the corporate department had very substantial accounts receivable that eventually would more than offset the distributions he was taking. In fact, the corporate department did have substantial accounts receivable.

"[Although] the plaintiff consented to these distributions, that consent was based upon the [defendant's] representations that draw[s] from the credit line which financed the distributions would be repaid through the collection of the corporate department accounts receivable in approximately six months. The credit line was eventually, though well past the represented time frame, paid in full through these corporate department assets shortly before the dissolution of the firm. However, the practice left the partners' capital accounts in a relationship that was directly in contradiction to the express provisions of the partnership agreement. The partnership agreement states that 'distributions shall be made monthly and at such other times as the partners agree such that, following any such distribution, the capital account balances of the partners shall be directly proportionate to the ownership percentage of such partners.' In other words, at any given point in time, the defendant's capital account balance should be 57 percent of the total capital account balance of the two partners, and the plaintiff's capital account balance

should be 43 percent of that total. [Although] the plaintiff may have consented to distributions that were temporarily in excess of the amount [that] the defendant was entitled to receive under the [partnership agreement], there was no evidence that such consent was intended to be a permanent amendment to the partnership agreement. Nor is there any evidence that such accommodation was intended to alter the financial relationship between the partners or between the partners and the firm. Nor is there any evidence to suggest that, upon dissolution and liquidation of the firm, the plaintiff would not be entitled to be paid 100 percent of his capital account or, at least, an amount equal to 43 percent of the firm's capital after payment of the firm's liabilities.

"Both partners had firm credit cards and both partners were allowed to use those credit cards for personal expenses . . . . To the extent they did so, such personal expenses were treated as distributions to the respective partner with a corresponding reduction in the partner's capital account. The defendant engaged in this practice to a greater extent than the plaintiff, particularly subsequent to June, 2013, when, as a result of disagreements between the partners, the firm suspended monthly cash distributions. [Although] the personal expenses were properly accounted for, those expenditures further reduced the defendant's capital account in relation to that of the plaintiff.

"The result of all of this was that, on November 15, 2013, the date of the dissolution of the partnership, the plaintiff's capital account was $178,436 and the defendant's capital account was $46,191. Moreover, the defendant, acting in his capacity as liquidating trustee of the partnership, assigned to himself all of the accounts receivable and work[s] in progress of the corporate department in a document dated November 16, 2013. The defendant, by document also dated November 16, 2013, offered to assign to the plaintiff all of the accounts receivable of the trust and estate departments. The assignment of the corporate department work[s] in progress and accounts receivable as of November 16, 2013 . . . had the effect of diverting from the partnership cash that would have brought the partners' capital accounts back to the proportional relationship required by the partnership agreement. Moreover, the balance sheet of the partnership indicates that, as of November 15, 2013, there were insufficient assets, and particularly liquid assets, remaining in the partnership from which the plaintiff could be paid the amount due him based upon his capital account and its relationship to the defendant's capital account.

"The plaintiff did not accept distribution of the trust and [estate department's] accounts receivable on or about November 16, 2013. During the weeks following November 16, 2013, up until at least December 31, 2013,

he continued to deposit the funds generated by those receivables into the partnership account. This caused his capital account balance to increase even further. Accordingly, on December 31, 2013, the capital account balance of the plaintiff was $279,856 and the capital account balance of the defendant was $36,734. The plaintiff did accept assignment of the accounts receivable of the trust and [estate department] on January 15, 2014, and, at that time, he withdrew $113,363 from the partnership accounts with the consent of the defendant as a distribution of capital.

"The difference in the approach[es] that the parties took to the accounts receivable between November 15, 2013, and December 31, 2013, is reflective of the difference in the parties' approach[es] toward the winding up of the partnership business. [The defendant] believed that, upon dissolution, the parties should distribute the assets as quickly as possible, leaving in the firm accounts only [those] which [were] necessary to pay the final expenses of the partnership and, to the extent there were assets available beyond what was necessary to pay the remaining obligations of the firm, they should be distributed immediately to accommodate the ongoing business of the successor firms. [The plaintiff] believed all assets of the firm, including accounts receivable, should continue to be collected until such time as all firm obligations had been paid or otherwise dealt with, until the lease liability was resolved and until an agreement on capital account adjustments had been reached. Distribution should occur subsequently. Whether because of a change in viewpoint or as a practical necessity, [the plaintiff] in January, 2014, took a cash distribution of $113,363 with the defendant's consent. In the spring of 2014, [the plaintiff] also took a $64,000 cash distribution without the defendant's consent." (Footnotes omitted.)

After the date of the defendant's withdrawal letter, but prior to the partnership's date of dissolution, the plaintiff brought this action seeking, among other things, an injunction to prevent the defendant from winding up the affairs or liquidating and distributing the assets of the partnership. The injunction was denied. In the five count operative complaint, the plaintiff alleged that the defendant breached his fiduciary duty, breached the partnership agreement and converted partnership property. He also sought an order for judicial oversight and an accounting. The defendant filed a counterclaim alleging breach of contract and statutory theft, and seeking damages and attorney's fees. After a trial to the court, the court found that the defendant breached the partnership agreement and awarded damages of $30,384 to the plaintiff, which the court later amended to $34,120. The court also awarded $103,000 in attorney's fees and $6226.73 in costs to the plaintiff. The defendant's claim for attorney's fees was denied. The defendant appealed and the plaintiff cross

appealed. We will set forth additional facts as necessary.

## I

### DEFENDANT'S APPEAL

The defendant claims on appeal that the court erred in (1) finding a breach of § 3.02 of the partnership agreement; (2) finding a breach of § 4.03 of the partnership agreement; (3) ordering the defendant to pay damages directly to the plaintiff rather than reducing the defendant's capital account; and (4) awarding attorney's fees and costs to the plaintiff.

### A

The defendant first claims that the trial court erred in finding a breach of § 3.02 of the partnership agreement.[4] We disagree.

"Except as otherwise provided [in this section], relations among the partners and between the partners and the partnership are governed by the partnership agreement. . . ." General Statutes § 34-303 (a). "Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual communications is a question of law . . . subject to plenary review by this court. . . . In giving meaning to the terms of a contract, the court should construe the agreement as a whole, and its relevant provisions are to be considered together. . . . The contract must be construed to give effect to the intent of the contracting parties. . . . This intent must be determined from the language of the instrument and not from any intention either of the parties may have secretly entertained. . . . [I]ntent . . . is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . [Where] . . . there is clear and definitive contract language, the scope and meaning of that language is not a question of fact but a question of law. . . . In such a situation our scope of review is plenary, and is not limited by the clearly erroneous standard. . . . Whether a contract is ambiguous is a question of law subject to plenary review." (Citations omitted; internal quotation marks omitted.) *Schwartz* v. *Family Dental Group, P.C.*, 106 Conn. App. 765, 771, 943 A.2d 1122, cert. denied, 288 Conn. 911, 954 A.2d 184 (2008).

There is an animating difference between the parties' interpretations of the partnership agreement. The defendant's position is that once the date of dissolution arrived, in this case November 15, 2013, he was entitled to withdraw for his sole benefit all of the assets of the corporate department without regard to the provisions of article III of the agreement. The plaintiff, on the

other hand, maintains that distributions throughout the liquidation process were subject to article III, and that, in general, partnership expenses were to be subtracted from revenues prior to distribution and that distributions were to be made such that the 57 to 43 ratio of partnership assets was to be maintained. We agree with the plaintiff.

There is no merit to the defendant's contention that he was free, during the liquidation process, to assign all corporate revenue to himself without regard to expenses and the maintenance of the ratio of partnership assets in the partners' capital accounts. The agreement unambiguously required the prescribed distribution procedures to continue through the period of liquidation. First, § 8.01, entitled "Dissolution of Partnership," provided that the costs "in respect of such dissolution" were to be allocated in accordance with the departmental profit calculation, which, as we have seen, allocated revenues to the several departments, then assigned expenses to each department, and finally provided that the required ratio between the capital accounts was to be realized immediately following any distribution (except perhaps the final distribution). Second, in § 8.02, the agreement provided that upon dissolution, the partners became liquidating trustees and that the expenses were to be apportioned; the business of the partnership could be continued until the final distributions were made. Third, as spelled out in § 8.03, upon liquidation, all assets of the partnership *net of partnership liabilities* were to be distributed according to the departmental profit calculation. The agreement, then, expressly contemplated that the allocation process was to continue from the date of dissolution—here, November 15, 2013—through the period of liquidation until and including, at least with respect to the "remaining" capital account, the final distribution. There is nothing in the agreement indicating that the allocation process was to cease at the date of dissolution, such that either partner was free to appropriate partnership assets.[5]

As previously cited, the specific provisions of article VIII, pertaining to dissolution and liquidation, refer to the distribution of *net* assets and adherence to the departmental profit calculation. The final distribution was to be made "in accordance with the departmental profit calculation." Section 8.01. Similarly, there is nothing in article III, which details the calculation and balancing of accounts, to suggest that the specifically designed balancing of accounts was to be abandoned when one partner gave notice of his intention to withdraw. In sum, the clear language of the agreement provided that the allocation of partnership revenues and expenses was to continue through the time of the final distributions, and § 3.02 provided that distributions were to be made such that, after each distribution, the capital account balances were to be in proportion to the partners' ownership interests. By distributing revenues

from the corporate account to himself without regard to the required ratio of partnership assets in the partners' capital accounts, the defendant breached § 3.02 of the agreement, as the court correctly determined.

The trial court noted that "[t]he defendant's assignment to himself of the accounts receivable and work[s] in progress of the corporate department upon dissolution, *under some circumstances*, would be harmless to the plaintiff" because the defendant would have been entitled ultimately to the net profits under the partnership agreement's terms. (Emphasis in original.) This is entirely correct; however, with the capital accounts out of balance, the plaintiff was left bearing a disproportionate share of the remaining liabilities postdissolution. Thus, we agree with the trial court that the defendant's assignment of the corporate department's accounts receivable and works in progress without regard to the ratio of partnership assets in the partners' capital accounts, as reconciled pursuant to the departmental profit calculation, breached § 3.02 of the partnership agreement.

B

The defendant also challenges the court's conclusion that he breached § 4.03 of the partnership agreement. Section 4.03, as previously discussed, concerned restrictions on the partners' conduct. The defendant claims that because he had sole discretion regarding the provision of corporate services pursuant to § 4.02 (a), and that § 4.03 is subject to § 4.02, he did not breach § 4.03 by assigning the corporate accounts receivable and works in progress to his new firm. We conclude that there was no breach of § 4.03.

"The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." (Internal quotation marks omitted.) *Chiulli* v. *Zola*, 97 Conn. App. 699, 706–707, 905 A.2d 1236 (2006). If the plaintiff suffers no actual damage, there can be no recovery. See *Waicunas* v. *Macari*, 151 Conn. 134, 139, 193 A.2d 709 (1963).

Article IV of the partnership agreement, entitled "Management; Restrictions," pertained to governance of the partnership. Section 4.01 named the defendant as managing partner, except in cases where he is unable to act. Section 4.02 provided for decision-making power pertaining to the provision of services within the three departments. Section 4.03 was a list of restrictions on the partners' activities. The section concluded: "If a partner commits any breach of the [restrictions], any losses or other expenses (including but not limited to reasonable [attorney's] and [accountant's] fees) on account thereof shall be allocated exclusively to such partner's capital account."

At trial, the court found that the defendant breached

§ 4.03 (b) by assigning corporate accounts receivable and works in progress to his new firm. Section 4.03 (b) provided that a partner shall not "assign, transfer, pledge, compromise or release any of the partnership's claims, or debts, except upon payment in full, or arbitrate, or consent to the arbitration of any of its disputes or controversies . . . ."

Each of the restrictions listed in § 4.03 pertained to the partnership's dealings with third parties, and the final paragraph of § 4.03 provided that the remedy for a partner's breach of a restriction was the allocation of a resulting loss or expense to that partner's capital account. Section 4.03 created an accounting method for penalizing breaching partners for liabilities they might incur for the partnership that may not otherwise be assessed under either General Statutes § 34-327 (c) or § 2.04 of the partnership agreement. See footnotes 6 and 7 of this opinion. Principles of limited liability shield the partners from indemnification for debts and expenses of the partnership, with some exceptions, but the list of restrictions in § 4.03 provided specific exceptions to immunity, such that only the breaching partner's account was to be affected, and, when the time came for distributions, the amount of the breaching partner's distribution would be decreased accordingly. The function of § 4.03, then, was to allocate partnership losses or obligations to a single partner if that partner had violated a restriction listed in that section.

When the defendant assigned corporate assets to himself or to his new firm, however, he did not create additional liabilities for the partnership. He instead altered the balance of corporate accounts and prevented orderly payment of existing liabilities. Thus, there were no partnership losses or expenses "on account" of the defendant's breach, as required in the partnership agreement. Without partnership losses or expenses, there was no actionable breach of contract on the basis of § 4.03. Therefore, the trial court erred in finding a breach of § 4.03 of the partnership agreement, which, in itself, caused damages.

Even if the defendant's assignment of assets to himself could be deemed to be a breach of § 4.03 (b), as found by the court, the sole remedy for the breach was to be the assignment of that expense to the breaching partner's capital account. In the circumstances of this case, the breach occurred, as we previously held in part I A of this opinion, when the *distributions* were made to the defendant without regard for the balance of accounts in violation of § 3.02. The breach causing harm, then, was the breach of § 3.02, and the damages are the same under either theory of recovery.

C

The defendant also claims that the trial court erred in ordering the defendant to pay damages to the plaintiff

directly rather than ordering only a reduction in the defendant's capital account, contrary to provisions of both the partnership agreement and the act. We are not persuaded.

As noted in part I A of this opinion, our review of unambiguous contract provisions is plenary. *Schwartz* v. *Family Dental Group, P.C.*, supra, 106 Conn. App. 771. The interpretation and construction of statutes are also subject to plenary review. See *Magee* v. *Commissioner of Correction*, 105 Conn. App. 210, 214, 937 A.2d 72, cert. denied, 286 Conn. 901, 943 A.2d 1102 (2008).

"Our standard of review of an award of damages . . . is well settled. [T]he trial court has broad discretion in determining whether damages are appropriate. . . . Its decision will not be disturbed on appeal absent a clear abuse of discretion." (Internal quotation marks omitted.) *Aurora Loan Services, LLC* v. *Hirsch*, 170 Conn. App. 439, 447, 154 A.3d 1009 (2017). "In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only [when] an abuse of discretion is manifest or [when] injustice appears to have been done." (Internal quotation marks omitted.) *Weiss* v. *Smulders*, 313 Conn. 227, 261, 96 A.3d 1175 (2014).

The defendant contends that § 2.04 of the partnership agreement, particularly subsections (a) and (b), prevented his being found liable directly to the plaintiff.[6] He adds that the language of § 2.04 largely tracked the language of § 34-327 (c),[7] and that these provisions are both unambiguous.

The defendant quite correctly contends that pursuant to both the partnership agreement and the statutory provision, a partner is not personally liable for the debts of the partnership or another partner. The defendant also acknowledges that, pursuant to § 34-327 (d), "[t]he provisions of subsection (c) of this section shall not affect the liability of a partner in a registered limited liability partnership for his own negligence, wrongful acts or misconduct . . . ." The defendant asserts that in this case the court found no negligence, wrongful acts, or misconduct. In the context of deciding whether the defendant was entitled to attorney's fees, however, the court found that "[w]hen the defendant assigned to himself the corporate accounts receivable, to the extent that it exceeded the ability of the firm to obtain receipts necessary to bring the capital accounts back to their appropriate proportions, he did this over the objection of the plaintiff and this constituted wilful misconduct." This finding of the court, although enunciated in a separate memorandum of decision regarding, among other issues, attorney's fees, is clear and relevant, and negates the defendant's argument that § 34-327 bars a determination of liability.[8]

Similarly, the partnership agreement itself expressly sets forth an exception to otherwise limited liability: "[N]o partner shall be liable, responsible, or accountable in damages or otherwise to the partnership or to any other partner . . . for any losses, claims, damages, or liabilities arising from . . . any act performed, or any omission to perform any act, by such partner in [his] capacity as a partner, *except by reason of acts or omissions in violation of the express terms of this agreement* . . . ." (Emphasis added.) Section 2.04 (a) (ii). The defendant violated § 3.02, an express term of the partnership agreement. Thus, pursuant to the terms of the agreement, the defendant may be personally liable for his breach of the partnership agreement.

The defendant additionally claims that the only remedy for a breach is a reduction in his capital account; he points to several sections of the agreement for support. He urges that § 4.03 provided that the only remedy for violating that section is a corresponding reduction of that partner's capital account, but, as we decided in part I B of this opinion, there was no actionable breach of article IV in any event. The defendant also points out that § 3.03 of the partnership agreement required that all expenses and losses *of the partnership* resulting from a partner's wrongful act are to be charged to the partner's capital account.[9] The defendant's actions, however, caused an internal maladjustment of accounts rather than a loss to the partnership.

More to the point, and undermining the defendant's claims regarding damages, is the simple proposition that the defendant breached the agreement *because* he distributed partnership assets to himself without observing the balance of corporate accounts. If the sole remedy for the breach of a duty to a partner was to reduce the breaching partner's capital account, but then the breaching partner could nonetheless blithely distribute assets to himself without regard to the relative states of the accounts, then that remedy would be rendered utterly meaningless. The remedy for most breaches, to be sure, was reduction of the particular capital account; when the time came for *distribution*, the remedy would functionally be realized. When the breach *is* the distribution, however, the situation is intrinsically different, and the parties' agreement did not require merely a further pointless reduction in a capital account—especially after liquidation. The court did not abuse its discretion in ordering a direct payment from the defendant to the plaintiff.

### D

The defendant finally claims that the trial court erred in awarding attorney's fees to the plaintiff. The court awarded attorney's fees pursuant to § 4.03 of the partnership agreement and then concluded that Chioffi should be indemnified for this expense pursuant to

§ 2.04 (c). As we have determined in part I B, however, the court erred in finding an actionable breach of contract pursuant to § 4.03. The provision in § 4.03 allowing for attorney's fees was expressly limited to breaches of the "restrictions" of that section. Because no other basis for attorney's fees was found by the court,[10] we vacate the award of attorney's fees under § 4.03.

## II

### PLAINTIFF'S CROSS APPEAL

The plaintiff claims on cross appeal that the court (1) erred in not finding a breach of fiduciary duty; (2) erred in its calculation of damages; and (3) abused its discretion in finding that the plaintiff waived his claim for an accounting.

### A

The plaintiff first claims that the trial court erred in declining to conclude that the defendant breached a fiduciary duty. We agree.

"[T]he determination of whether a duty exists between individuals is a question of law. . . . Only if a duty is found to exist does the trier of fact go on to determine whether the defendant has violated that duty. . . . When the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Biller Associates* v. *Peterken*, 269 Conn. 716, 721–22, 849 A.2d 847 (2004). Alternatively, our Supreme Court has upheld jury instructions that state that it is a question of law as to what constitutes a breach of a duty, but a question of fact as to whether such a breach occurred. *Dunbar* v. *Jones*, 87 Conn. 253, 258–59, 87 A. 787 (1913); see also *Stevens* v. *Pierpont*, 42 Conn. 360, 361–62 (1875) ("[w]hether certain facts do or do not constitute a breach may, in some circumstances, be a question of law; or at least, a mixed question of law and fact"). Appellate review of facts on which a claim of breach of fiduciary duty is based is subject to the clearly erroneous standard. See *Spector* v. *Konover*, 57 Conn. App. 121, 126, 747 A.2d 39, cert. denied, 254 Conn. 913, 759 A.2d 507 (2000).

"It is a thoroughly well-settled equitable rule that any one acting in a fiduciary relation shall not be permitted to make use of that relation to benefit his own personal interest. This rule is strict in its requirements and in its operation. It extends to all transactions where the individual's personal interests may be brought into conflict with his acts in the fiduciary capacity, *and it works independently of the question whether there was fraud or whether there was good intention.* Where the possibility of such a conflict exists there is the danger intended to be guarded against by the absoluteness of the rule. The underlying thought is that an agent or other fiduciary should not unite his personal and his

representative characters in the same transaction; and equity will not permit him to be exposed to the temptation, or be brought into a situation where his own personal interests conflict with the interests of his principal and with the duties he owes to his principal. The rule applies [to] partners . . . ." (Emphasis added.) *Mallory* v. *Mallory Wheeler Co.*, 61 Conn. 131, 137–38, 23 A. 708 (1891); *Spector* v. *Konover*, supra, 57 Conn. App. 128.

"[P]roof of a fiduciary relationship imposes a twofold burden on the fiduciary. First, the burden of proof shifts to the fiduciary; and second, the standard of proof is clear and convincing evidence. Once a fiduciary relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary. . . . Furthermore, the standard of proof for establishing fair dealing is not the ordinary standard of proof of fair preponderance of the evidence, but requires proof . . . by clear and convincing evidence . . . . We have recognized that, generally, partners are bound in a fiduciary relationship and act as trustees toward each other and toward the partnership." (Citation omitted; internal quotation marks omitted.) *Oakhill Associates* v. *D'Amato*, 228 Conn. 723, 726–27, 638 A.2d 31 (1994). "The fiduciary duty of loyalty is breached when the fiduciary engages in self-dealing by using the fiduciary relationship to benefit [his or] her personal interest." *Mangiante* v. *Niemiec*, 82 Conn. App. 277, 284, 843 A.2d 656 (2004).

The first count of the operative complaint alleged that the defendant breached his fiduciary duty. The count included detailed factual allegations. Included were allegations that (1) the defendant and the plaintiff were partners in a limited liability partnership; (2) § 3.02 required any distributions to be made such that, following any distribution, the capital accounts balances of the partners were to be proportionate to their ownership interests; (3) Martin was the "managing partner"; (4) on dissolution, the partners became liquidating trustees; (5) the defendant caused distributions such that balances remained disproportionate, thus violating § 3.02 of the agreement; and (6) the defendant breached his fiduciary duties as a partner and as a liquidating trustee.[11]

As we stated at some length previously in this opinion, the court found the relevant factual allegations to be true. In its memorandum of decision, however, the court rendered judgment in favor of the plaintiff only as to count four, which alleged breach of contract. With no explanation, the court rendered judgment in favor of the defendant "on the remaining counts of the complaint." In the unusual circumstances presented, we hold that the court erred in not concluding that the defendant breached his fiduciary duty, in light of the facts which the court found.[12]

The elements which must be proved to support a conclusion of breach of fiduciary duty are: "[1] [t]hat a fiduciary relationship existed which gave rise to . . . a duty of loyalty . . . an obligation . . . to act in the best interests of the plaintiff, and . . . an obligation . . . to act in good faith in any matter relating to the plaintiff; [2] [t]hat the defendant advanced his or her own interests to the detriment of the plaintiff; [3] [t]hat the plaintiff sustained damages; [and] [4] [t]hat the damages were proximately caused by the fiduciary's breach of his or her fiduciary duty." (Emphasis omitted; internal quotation marks omitted.) *Rendahl* v. *Peluso*, 173 Conn. App. 66, 100, 162 A.3d 1 (2017). As a partner and liquidating trustee, the defendant was in a fiduciary relationship with the plaintiff. See *Oakhill Associates* v. *D'Amato*, supra, 228 Conn. 727. Further, the court found, on voluminous facts, a breach of § 3.02, from which it could only be concluded that the defendant advanced his interests to the detriment of the plaintiff's interests.

Where a fiduciary relationship exists, the burden shifts to the fiduciary to show fair dealing by clear and convincing evidence. Id., 726–27. On the facts found, however, the court could not logically have concluded that the defendant sustained his burden to show fair dealing by clear and convincing evidence.

"Important factors in determining whether a particular [self-dealing] transaction is fair include a showing by the fiduciary: (1) that he made a free and frank disclosure of all the relevant information he had; (2) that the consideration was adequate . . . (3) that the principal had competent and independent advice before completing that transaction . . . [and] (4) the relative sophistication and bargaining power among the parties."[13] (Citation omitted; internal quotation marks omitted.) *Konover Development Corp.* v. *Zeller*, 228 Conn. 206, 228, 635 A.2d 798 (1994). This standard was later invoked in *Spector* v. *Konover*, supra, 57 Conn. App. 121. In *Spector*, the plaintiff general partner claimed that his partners, the defendants, had breached their fiduciary duties by diverting funds from the partnership to other properties owned by one of the codefendants. Id., 122–26. The trial court concluded that, although the defendants owed the plaintiff a fiduciary duty, "they proved by clear and convincing evidence that they dealt with the plaintiff fairly and that they breached no fiduciary duty." Id., 126. This court reversed the trial court's judgment in favor of the defendants, holding that "[t]he defendants' practice of diverting [partnership] funds to other entities and retaining interest earned on [those] partnership funds constitute[d] a breach of fiduciary duty." Id., 127–28. Further, this court concluded that the misuse of partnership property for personal gain was "a clear case of self-dealing and a violation of [the defendants'] fiduciary duty to the plaintiff." Id., 128.

This court then considered the aforementioned *Zeller* factors, and held that the defendants' failure to make free and frank disclosure thwarted any attempt to claim fair dealing. See id., 128–30.

Here, the defendant took partnership assets, at least some of which could have been used to pay partnership liabilities, and left Chioffi "holding the bag" while the defendant's capital account was negative. Although the defendant did inform the plaintiff of his intentions and the parties were both sophisticated lawyers, in this case the defendant proceeded over the objection of the plaintiff, who received no benefit or consideration for the self-dealing distributions made by the defendant.[14]

The defendant contends that he nonetheless violated no fiduciary duty. He urges in his brief that the language of the partnership agreement provided that the parties have no fiduciary obligations "except as may be provided under this Agreement and by other applicable law." The defendant has omitted a term: § 2.04 (a) (ii) provided that "no partner . . . has any fiduciary obligation . . . except as may be provided under this agreement, *the act* and by other applicable law." (Emphasis added.)

The act expressly provides that "[a] partner's duty of loyalty to the partnership and other partners is limited to the following: (1) To account to the partnership and hold as trustee for it any property, profit or benefit derived by the partner in the conduct and winding up of the partnership business . . . ."; General Statutes § 34-338 (b); and General Statutes § 34-303 (b) (3) provides in relevant part that a partnership agreement may not "[e]liminate the duty of loyalty . . . ." The duty of loyalty may also be found in "other applicable law"; this court held in *Springfield Oil Services, Inc.* v. *Conlon*, 77 Conn. App. 289, 302, 823 A.2d 345 (2003), that "[t]he terms of a limited partnership agreement cannot negate the fiduciary duty of the general partner even where the relationship and terms of a contract between the fiduciary and its affiliate are disclosed and even where the partnership involves sophisticated parties." The partnership agreement, then, did not compromise or expressly limit the duty of loyalty as prescribed by law.

On the facts found by the court, we hold that the court erred in not concluding that the defendant breached his fiduciary duty to the plaintiff. The compensatory damages, however, remain those found by the court for the breach of contract. Both breaches caused the same harm, the disproportionate corporate accounts after distribution. The court awarded compensatory damages for breach of contract, and courts ought not countenance duplicative damages.

Breach of fiduciary duty, however, is a tort; *Ahern* v. *Kappalumakkel*, 97 Conn. App. 189, 192 n.3, 903 A.2d 266 (2006); and punitive damages may result from a

breach of fiduciary duty. See *Rendahl* v. *Deluso*, supra, 173 Conn. App. 100–101. The complaint requested attorney's fees for the breach of fiduciary duty, and attorney's fees may, where found to be appropriate, be allowed as damages for breach of fiduciary duty. Punitive damages in this context generally are limited to attorney's fees and costs. *Hylton* v. *Gunter*, 313 Conn. 472, 474, 97 A.3d 970 (2014).[15]

The court awarded attorney's fees, but its award was premised on a breach of § 4.03 of the partnership agreement and was limited to work performed on that particular issue. Because any award of punitive damages would instead arise from a breach of fiduciary duty, the analysis may differ. Also, "[a]n award of attorney's fees is not a matter of right. Whether any award is to be made and the amount thereof lie within the discretion of the trial court, which is in the best position to evaluate the particular circumstances of a case." (Internal quotation marks omitted.) *LaMontagne* v. *Musano, Inc.*, 61 Conn. App. 60, 63–64, 762 A.2d 508 (2000). Finally, in order for a court to award punitive damages, "the pleadings must allege and the evidence must be sufficient to allow the trier of fact to find that the defendant exhibited a reckless indifference to the rights of others or an intentional and wanton violation of those rights." (Internal quotation marks omitted.) *Landmark Investment Group, LLC* v. *CALCO Construction & Development Co.*, 318 Conn. 847, 878, 124 A.3d 847 (2015). On remand, the trial court is to determine whether the plaintiff is entitled to attorney's fees because of the defendant's breach of fiduciary duty, and, if so, in what amount.

B

The plaintiff next claims that the trial court erred in failing to render judgment against the defendant for the full amount of damages resulting from the defendant's conduct. The plaintiff claims that the defendant should be ordered to return to the partnership all funds diverted by him so that the plaintiff in turn can receive the full amount of his corrected capital account. We are not persuaded that there was reversible error in this regard.

The plaintiff cites no authority for this claim other than a general rule of damages. It appears that the plaintiff claims that he would be able to obtain more of the partnership assets if the defendant were required to return the value of all of the diverted corporate assets to the partnership. We disagree with his claim.

"The assessment of damages is peculiarly within the province of the trier and the award will be sustained so long as it does not shock the sense of justice. The test is whether the amount of damages awarded falls within the necessarily uncertain limits of fair and just damages. . . . There are no unbending rules as to the

evidence by which [damages for breach of contract] are to be determined. . . . In making its assessment of damages for breach of [any] contract the trier must determine the existence and extent of any deficiency and then calculate its loss to the injured party. The determination of both of these issues involves a question of fact which will not be overturned unless the determination is clearly erroneous." (Citation omitted; internal quotation marks omitted.) *Chila* v. *Stuart*, 81 Conn. App. 458, 466–67, 840 A.2d 1176, cert. denied, 268 Conn. 917, 847 A.2d 311 (2004).

The court's theory in awarding damages was to calculate the amount that would have been distributed by the partnership to the plaintiff if the defendant had adhered to the requirements of the partnership agreement, and the liabilities had not been satisfied predominantly by the plaintiff's share. The court engaged in a detailed analysis, which included a consideration of the plaintiff's benefiting from a transfer of the security deposit and credit for rent to the plaintiff's new firm. Any additional funds placed in the defendant's capital account *necessarily* would have been profits of the corporate department, to which the plaintiff was not entitled once the departmental profit calculation was performed. The trial court did not abuse its discretion in its method of calculating damages.[16]

### C

The plaintiff finally claims that the trial court abused its discretion by holding that the plaintiff waived his claim for an accounting. We disagree.

"Waiver is the intentional relinquishment or abandonment of a known right or privilege. . . . Waiver does not have to be express, but may consist of acts or conduct from which waiver may be implied." (Internal quotation marks omitted.) *MSO, LLC* v. *DeSimone*, 313 Conn. 54, 64, 94 A.3d 1189 (2014). "Waiver is a question of fact. . . . [W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . [T]he trial court's conclusions must stand unless they are legally or logically inconsistent with the facts found or unless they involve the application of some erroneous rule of law material to the case. . . . [V]arious statutory and contract rights may be waived." (Citations omitted; internal quotation marks omitted.) *AFSCME, Council 4, Local 704* v. *Dept. of Public Health*, 272 Conn. 617, 622–23, 866 A.2d 582 (2005).

### i

We consider (1) whether an accounting can be waived and (2) whether the court clearly erred in finding a waiver. We hold that an accounting can be waived and

that the court did not abuse its discretion in finding that the plaintiff waived his claim.

a

"As a general rule, both statutory and constitutional rights and privileges may be waived." (Internal quotation marks omitted.) *Dinan* v. *Patten*, 317 Conn. 185, 195, 116 A.3d 275 (2015). The remedy of an accounting is codified in General Statutes § 52-401, which provides: "In any judgment or decree for an accounting, the court shall determine the terms and principles upon which such accounting shall be had." Thus, the remedy is statutory.

In years past, the common law of our state mandated an accounting if certain criteria were met, including the existence of a fiduciary relationship. See, e.g., *Zuch* v. *Connecticut Bank & Trust Co.*, 5 Conn. App. 457, 460, 500 A.2d 565 (1985) ("[t]he fiduciary relationship is in and of itself sufficient to form the basis for [an accounting]"). In fact, an accounting was a prerequisite to any action at law upon the termination of a partnership. See *Weidlich* v. *Weidlich*, 147 Conn. 160, 163–64, 157 A.2d 910 (1960). "A final account is the one great occasion for a comprehensive and effective settlement of all partnership affairs. All the claims and demands arising between the partners should be settled upon such an accounting." Id., 165.

Over the years, the need for a formal judicial accounting has evolved, such that courts of other jurisdictions have held that "an action can be maintained by one partner against another, even where the partnership transaction is the basis of the suit, if the facts are such that no complex accounting involving a variety of partnership transactions is necessary." *Hanes* v. *Giambrone*, 14 Ohio App. 3d 400, 404, 471 N.E.2d 801 (1984); see also *Moody* v. *Headrick*, 247 Ala. 455, 457, 25 So. 2d 137 (1946); *Lau* v. *Valu-Bilt Homes, Ltd.*, 59 Haw. 283, 290, 582 P.2d 195 (1978); *Balcor Income Properties, Ltd.* v. *Arlen Realty, Inc.*, 95 Ill. App. 3d 700, 702, 420 N.E.2d 612 (1981); *Clarke* v. *Mills*, 36 Kan. 393, 397, 13 P. 569 (1887); *Kolb* v. *Dietz*, 454 S.W.2d 632, 636 (Mo. App. 1970); *Auld* v. *Estridge*, 86 Misc. 2d 895, 900–901, 382 N.Y.S.2d 897 (1976), aff'd, 58 App. Div. 2d 636, 395 N.Y.S.2d 969, leave to appeal denied, 43 N.Y.2d 641, 371 N.E.2d 830, 401 N.Y.S.2d 1025 (1977); *Zimmerman* v. *Lehr*, 176 N.W. 837, 837 (N.D. 1920); *Doyle* v. *Polle*, 121 Vt. 335, 338, 157 A.2d 226 (1960). Our Superior Court, in *Canton West Associates* v. *Miller*, 44 Conn. Supp. 321, 325–27, 688 A.2d 1360 (1995), adopted this more flexible standard in reaching its decision.

The more flexible approach finds some support in our appellate precedent. See *Mankert* v. *Elmatco Products, Inc.*, 84 Conn. App. 456, 460, 854 A.2d 766 ("[a]n accounting is not available in an action where the amount due is readily ascertainable" [internal quotation

marks omitted]), cert. denied, 271 Conn. 925, 859 A.2d 580 (2004). Likewise, after *Canton West Associates*, the General Assembly revised the act to allow a partner to "maintain an action against . . . another partner for legal or equitable relief, *with or without an accounting as to partnership business* . . . ." (Emphasis added.) General Statutes § 34-339 (b).

Under current law, an accounting is not mandatory merely because it is requested: many situations may require a formal judicial accounting; in others, discovery may suffice. In the absence of an absolute requirement in the partnership agreement, § 34-339 (b) provides that an accounting is discretionary, and the statutory provision in this regard supersedes vestigial common law to the contrary. See *Brennan* v. *Brennan Associates*, 293 Conn. 60, 92, 977 A.2d 107 (2009) ("[w]hen the . . . [statute] articulating a public policy also includes certain substantive limitations in scope or remedy, these limitations also circumscribe the common law" [internal quotation marks omitted]). The statutory provision echoes a general principle of equity. See *Papallo* v. *Lefebvre*, 172 Conn. App. 746, 763, 161 A.3d 603 (2017) ("[t]he determination of what equity requires in a particular case [is] a matter for the discretion of the trial court" [internal quotation marks omitted]). An accounting, then, is waivable.

b

We turn to the issue of whether the plaintiff waived any ability to require an accounting. In *MSO, LLC* v. *DeSimone*, supra, 313 Conn. 64, our Supreme Court reaffirmed the principle that waiver may be found "when a party engages in substantial litigation without asserting its right to arbitrate." Analogously, the court here found that the plaintiff, having requested an accounting in his complaint, nonetheless proceeded to trial, in which the finances of the partnership were litigated at length. The plaintiff later reasserted the accounting claim after a decision had been issued.

The trial court, in its articulation, clarified and stated: "[T]he plaintiff included a . . . count for breach of contract . . . specifically breach of the [partnership agreement]. Consistent with [that] count . . . during seven days of trial, the plaintiff and the defendant introduced detailed evidence concerning the obligations and rights of the parties pursuant to the [partnership agreement], [and] the financial transactions that had occurred consistent with and inconsistent with the terms of the [partnership agreement]. . . . Additionally, both the plaintiff and [the] defendant testified at length concerning these documents and the various transactions that preceded the dissolution of the partnership, as well as transactions that occurred subsequent to the dissolution of the partnership.

"The plaintiff chose a particular approach during the

trial. Rather than merely establish the relationship between the plaintiff, the defendant, and the partnership, as well as a demand for an accounting . . . the plaintiff, consistent with [his] breach of contract count, elected to introduce the detailed evidence [that he] claimed substantiated his position and damages for breach of contract. . . .

"Once the introduction of evidence had begun, the plaintiff never asserted that [he] had insufficient evidence to pursue [his] breach of contract claims to the fullest. . . . Nowhere in [his] posttrial memorandum of law does the plaintiff request, expressly or impliedly, that the court order an accounting. . . .

"Indeed, in the section of [his] posttrial memorandum of law entitled 'Governing Legal Standards,' the plaintiff sets forth three sections [for breach of fiduciary duty, breach of contract, and conversion]. Nowhere in his posttrial memorandum of law does the plaintiff argue or set forth any legal standards, consistent with the evidence in the case, pursuant to which he would be entitled to an accounting. Moreover, subsequent to the section on governing legal standards, the plaintiff sets forth in the discussion and damages sections of the brief the detailed nature of the transactions of which the plaintiff complains, and seeks damages and a detailed analysis of the damages suffered by the plaintiff. . . .

"In the case at bar, not only did the court find that the plaintiff had an adequate remedy [at] law, but the plaintiff, based upon his posttrial briefs, also believed that [he] had an adequate remedy at law, and seemingly abandoned [his] request for an accounting. Under the circumstances of this case, it would have been inequitable to order an accounting subsequent to the plaintiff's attempt to persuade the court, in its role as trier of fact, that the evidence was sufficient to sustain [his] claim for damages for breach of contract.

"The plaintiff simply did not try or brief his case as though he was seeking the remedy of an accounting. Rather, the plaintiff clearly and unequivocally sought an award of damages from the court consistent with the evidence he had introduced and he thought was persuasive."

Thus, the court found that the plaintiff pleaded a count requesting an accounting, but did not mention that claim again until posttrial reargument. The plaintiff proceeded to litigate his claims and was successful on one of them. He claims, however, that he never actually abandoned his claim for an accounting and that the claim was extant until the court declined to order such, as requested during reargument. After reviewing the entire record, we do not conclude that the court committed clear error in its fact-finding or abused its discretion in reaching its conclusion of waiver.

We hold alternatively that even if there was no waiver, the court did not abuse its discretion in denying an accounting.

As noted previously, "[a]n accounting is not available in an action where the amount due is readily ascertainable." (Internal quotation marks omitted.) *Mankert* v. *Elmatco Products*, *Inc.*, supra, 84 Conn. App. 460. "Courts of equity have original jurisdiction to state and settle accounts, or to compel an accounting, where a fiduciary relationship exists between the parties and the defendant has a duty to render an account. . . . In an equitable proceeding, the trial court may examine all relevant factors to ensure that complete justice is done . . . ." (Internal quotation marks omitted.) *Papallo* v. *Lefebvre*, supra, 172 Conn. App. 763.

Here, the trial court considered detailed evidence of the partnership assets and accounts such that it was able to ascertain damages.[17] It was not until posttrial reargument that the plaintiff tried to reignite his accounting claim. The court noted in its November 28, 2016 articulation that because it determined that the trial, with available discovery, constituted an adequate remedy at law and that the plaintiff had apparently concurred, it chose not to exercise its equitable powers to order an accounting. We observe that the expense of an accounting and the resulting delay almost certainly outweigh whatever benefit would have been gained by ordering an accounting. We do not find an abuse of discretion in the trial court's decision denying an accounting.[18]

## III

### SUMMARY

In sum, the court's conclusion that the defendant breached § 3.02 of the partnership agreement is affirmed. The court erred in finding a breach of § 4.03 and in awarding attorney's fees on that basis. The court did not abuse its discretion in ordering a direct payment from the defendant to the plaintiff. The court erred in finding no breach of fiduciary duty. The court did not clearly err in its calculation of compensatory damages. The court did not err in finding a waiver of an accounting, nor, in the alternative, did it abuse its discretion in declining to order an accounting.

The judgment is reversed only as to the findings that the defendant breached his fiduciary duty and § 4.03 of the partnership agreement, and as to the award of attorney's fees, and the case is remanded for further proceedings on the issue of attorney's fees; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] The partnership itself, Martin Chioffi LLP (alternatively Martin & Chioffi LLP), was also named as a defendant, but is unrepresented and has not participated in the proceedings as a separate entity. All references to the defendant in this opinion are to Martin alone.

[2] The term "departmental profit calculation" appears in the agreement several times. According to the agreement, the "calculation" was attached to the agreement as an exhibit. The page so designated was blank. The parties appear to agree, however, that article III, described at some length previously, functioned as the "departmental profit calculation," as it indeed sets forth the method for determining and allocating department profit or loss.

[3] See footnote 2 of this opinion.

[4] The defendant's argument is premised on the contention that the court's analysis of the contractual obligations was erroneous; he does not claim, for the purpose of this argument, that the court's fact-finding was deficient.

[5] We note that, pursuant to article III, revenues were partnership assets, subject to allocation to different accounts. Once the accounting was accomplished, and expenses allocated as well, distributions could be made, either monthly or as otherwise agreed, and the capital accounts following each distribution were to be in the proper ratio. Revenues, then, initially were the property of the partnership rather than of the individual partner responsible for an account.

[6] Section 2.04 of the partnership agreement provided in pertinent part:

"(a) No Personal Obligation.

"(i) To the fullest extent permitted by the act and by other applicable law, no partner shall be personally liable for the return or repayment of all or any portion of the contributions to capital of any partner; any such return or repayment shall be made solely from the assets of the partnership.

"(ii) To the fullest extent permitted by the act and by other applicable law, no partner shall be liable, responsible, or accountable in damages or otherwise to the partnership or to any other partner . . . for any losses, claims, damages, or liabilities arising from (i) any act performed, or any omission to perform any act, by such partner in [his] capacity as a partner, *except by reason of acts or omissions in violation of the express terms of this agreement*; or (ii) the acts or omissions of any person other than such partner. No partner, in [his] capacity as a partner, has any fiduciary obligation or other duties to the partnership or any other partner, except as may be provided under this agreement, the act and by other applicable law.

"(b) Limitation of Liability. To the fullest extent permitted by the Act and by other applicable law, no partner of the partnership shall be liable or accountable, directly or indirectly (including by way of indemnification, contribution or otherwise), for any debts, obligations or liabilities of, or chargeable to, the partnership or each other, whether arising in tort, contract or otherwise, which are incurred, created or assumed by the partnership while the partnership is a registered limited liability partnership, solely by reason of being such a partner or acting (or omitting to act) in such capacity or rendering professional services or otherwise participating . . . in the conduct of the other business or activities of the partnership." (Emphasis added.)

[7] General Statutes § 34-327 (c) provides: "Subject to subsection (d) of this section, a partner in a registered limited liability partnership is not liable directly or indirectly, including by way of indemnification, contribution or otherwise, for any debts, obligations and liabilities of or chargeable to the Partnership or another partner or partners, whether arising in contract, tort or otherwise, arising in the course of partnership business while the Partnership is a registered limited liability partnership."

[8] The defendant claims that the plaintiff limited his claim to §§ 4.03 and 3.02, eliminating a claim under § 34-327 (d); however, the partnership agreement limits its provisions to what is allowed under § 34-327. Thus, we find no merit to the claim that § 34-327 (d) is inapplicable.

[9] Section 3.03 of the partnership agreement provided in relevant part: "[N]et losses of the partnership shall be allocated and apportioned in the same manner as set forth in section 3.01 . . . provided, however, that all expenses and losses resulting from the wrongful act or gross negligence of a partner (to the extent not covered by insurance) shall be charged to such partner in full."

[10] The court enunciated and refined its award of attorney's fees in its third memorandum of decision, dated September 10, 2015.

[11] The complaint contained many other allegations; for the purpose of this opinion we select those most relevant to the issues presented on appeal.

[12] This court similarly directed a judgment on a count alleging breach of fiduciary duty in *Spector* v. *Konover*, supra, 57 Conn. App. 134.

[13] The defendant, in his brief, alludes to, but does not explicitly cite, the *Zeller* factors.

[14] The record does not reflect whether the defendant received any independent advice from counsel prior to distributing the corporate assets. Because the defendant had the burden to prove that fact, the absence of any evidence in that regard works against him in proving fair dealing.

[15] Because punitive damages may include attorney's fees, we treat this claim for attorney's fees as a request for punitive damages. Although the plaintiff did not claim attorney's fees in the form of punitive damages but instead merely as "attorney's fees," the defendant "necessarily [was] on notice that punitive damages were being claimed because of the type of conduct pleaded and the fact that attorney's fees, [for this claim], could be obtained only through the awarding of punitive damages." *Stohlts* v. *Gilkinson*, 87 Conn. App. 634, 647, 867 A.2d 860, cert. denied, 273 Conn. 930, 873 A.2d 1000 (2005).

[16] The court's reasoning is further supported by its finding that the defendant's distribution of corporate assets to his new firm would in some circumstances be harmless. In other words, any distribution of assets of the corporate department beyond what was needed to meet existing liabilities were profits which ultimately would have been distributed to the defendant in any event in the final distribution, had the liquidation proceeded according to the agreement.

[17] Although absolute precision is ideal, "a plaintiff is not required to prove actual damages of a specific dollar amount." (Internal quotation marks omitted.) *Landmark Investment Group, LLC* v. *CALCO Construction & Development Co.*, supra, 318 Conn. 882.

[18] We note that this result is not inconsistent with *August* v. *Moran*, 50 Conn. App. 202, 717 A.2d 807 (1998). In *August*, an action for an accounting, the only issue was whether the trial court had properly rendered summary judgment in favor of the defendant on the ground that the plaintiff was collaterally estopped from litigating the amount of his overall partnership interest, where a prior case had determined the value of his capital account. Id., 203. This court held that a partnership interest was not necessarily identical to a capital account, and that the trial court erred in applying the doctrine of collateral estoppel. Id., 208. *August* did not address the question of whether an accounting was required or appropriate in the circumstances of that case.